UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| KIMBERLY STEPHENS, individually, | |
| Charging Party, | CASE NO.: |
| v. | COMPLAINT |
| FRANKLIN FOODS, INC., a Florida corporation, and HOCHLAND SE, a for profit limited company organized under the laws of the European Union, jointly and severally, | JURY TRIAL DEMANDED |
| Defendants. | |

NATURE OF ACTION

1.     Plaintiff Kimberly Stephens ("Ms. Stephens"), is a 48 year old African American female, who is a single parent of two who worked for Franklin Foods, Inc. ("Franklin" or the "Company"), and its parent corporation, Hochland SE ("Hochland") (Franklin and Hochland are collectively referred to as the "Defendants") for almost three years.

2.     Ms. Stephens began working for Defendants on January 22, 2018 until she was wrongfully terminated on September 16, 2020.

3.     Defendants engaged in unlawful employment practices on the basis of race and color, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and under the Florida Civil Rights Act of 1992, Florida Statutes §760.01, *et seq.* (the "FCRA").

4.      Ms. Stephens further alleges that Defendants engaged in race-based and color-based discrimination and harassment, retaliation and wrongful termination in violation of Title VII and the FCRA.

## THE PARTIES

5.      Hochland is a for-profit limited company organized under the laws of the European Union, with its corporate headquarters in Heimenkirch, Germany.

6.      Hochland operates is business in Boca Raton, Florida.

7.      Franklin is a for-profit business corporation organized under Delaware law, with its corporate headquarters in Boca Raton, Florida.  Franklin is a wholly owned subsidiary of Hochland.

8.      At all times relevant herein, Hochland and Franklin had at least fifteen employees, and was therefore an "employer" within the meaning of Title VII.

9.      Hochland and Franklin were also an "employer" within the meaning of the FRCA.

10.     Hochland and Franklin are liable for the acts of their agents and employees as set forth below.

11.     Ms. Stephens was, at all relevant times, an adult individual residing in Boynton Beach, Florida.

12.     The Defendants, individually or jointly, have employed Ms. Stephens, as each controlled her work schedule and employment conditions, determined her payment rate and method, and kept at least some records regarding her employment.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331.

14.     This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share all common operative facts with her federal law claims, and the parties are identical. Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

15.     Venue is proper in, and Defendants are subject to the personal jurisdiction of, this Court because Defendants each maintain facilities and business operations in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. §1391(b); 42 U.S.C. § 2000e-5(f)(3).

16.     Hochland and Franklin have availed themselves to the jurisdiction of this Court by maintaining facilities and business operations in this District.

17.     Hochland advertises Boca Raton, Florida as one of its business locations via the Internet, including on Linkedin.com and hochland-group.com.

18.     Hochland regularly receives and accepts business correspondence via U.S. mail in Boca Raton, Florida via offices also occupied by Franklin.

19.     Hochland advertises job openings for positions at Franklin via its website.

20.     Hochland and Franklin work in partnership out of Boca Raton, Florida, including regular visits by Hochland to Franklin's and Hochland's office in Boca Raton, Florida by Hochland employees, representatives and officers. Furthermore, Hochland

directs and controls Franklin's employment policies and procedures, including, but not limited to, equal employment, hiring and discharge policies.

21.     As further described below, Hochland acknowledges control and guidance over employment related matters associated with the Plaintiff and other employees at the Franklin and Hochland offices in Boca Raton, Florida.

22.     Based on information and belief, Hochland further maintains sales operations in the United States.

23.     Both Franklin and Hochland have availed themselves to the jurisdiction of this Court through sharing of its offices in Boca Raton, Florida and operating in Boca Raton, Florida and throughout the United States.

<u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>

24.     Plaintiff timely filed charges of discrimination within the United States Equal Employment Opportunities Commission ("EEOC"). On or around May 14, 2021, the EEOC issued Plaintiff's Notice of Right to Sue.

25.     Plaintiff has timely filed this action and have complied with all administrative prerequisites to bring the lawsuit.

<u>STATEMENT OF FACTS</u>

26.     Franklin is the third-largest cream cheese producer and second-largest private label cream cheese manufacturer in the United States, and its products are distributed to industrial, institutional, foodservice, private label, supermarket, and club store accounts across the United States and in several international markets.[1]

---

[1] https://www.franklinfoods.com/about-us/history/

27.     Franklin operates manufacturing facilities in Vermont and Arizona, with its corporate headquarters in Boca Raton, Florida.

28.     Hochland, a privately-held Germany-based company, is one of the largest manufacturers and refiners of cheese in Europe, with a growing international presence, including operations in and/or through offices in Boca Raton, Florida.

29.     Hochland focuses primarily on the production, refinement and sale of cheese and has at least ten production sites with a workforce of more than 4,000 employees.

30.     In January 2018, Ms. Stephens was hired by Franklin at a rate of $20.67/hour to fill the Accounts Payable staff position.

31.     Shortly thereafter, it became apparent that many of Franklin's policies and procedures were implemented and enforced by Hochland, ultimately governing the method and standards of Ms. Stephens' job duties and performance.

32.     In January 2019, Ms. Stephens received a positive performance review and was given an approximate 10% raise to $22.67/hour.

33.     In November 2019, starting once accountant Sara Anderson, a Caucasian female ("Ms. Anderson"), was on maternity leave, the then Chief Executive Officer of Franklin, John Gutknecht, relied more heavily on Ms. Stephens to also handle the tasks completed by Ms. Anderson. This required Ms. Stephens to work longer hours and on certain weekends, for which Ms. Stephens was paid overtime.

34.     In December 2019, Malissa Rambahal, the Vice-President of Finance was terminated, further increasing CEO Gutknecht's reliance on Ms. Stephens. Ms. Stephens work-load continued to increase through the first quarter of 2020.

35.     In February 2020, Zeke Rice, a Caucasian male, was hired by Franklin as the Chief Financial Officer ("CFO Rice").

36.     In March 2020, Ms. Anderson, a Caucasian female, returned from maternity leave and was promoted to Assistant Controller and a company-wide email announcement was made to employees of both Franklin and Hochland.

37.     In March 2020, after having received another positive performance review, Ms. Stephens was promoted to Accounts Payroll Supervisor and went from an hourly employee to a salaried employee at an annual salary of $55,000.00.

38.     No Company-wide announcement of Ms. Stephens promotion was ever made to the employees of either Franklin or Hochland.

39.     Ms. Stephens asked CFO Rice on three separate occasions whether there would be a Company-wide announcement for her promotion similar to Ms. Andersen, but was ignored and no public announcement for Ms. Stephens' promotion was ever made.

40.     One month later in April 2020, after continued positive performance, Ms. Stephens was given another raise of approximately 9% to an annual salary of $60,000.00.

41.     In May 2020, the only other African American woman in the Accounts Payable Department was terminated and Ms. Stephens was the only employee remaining in the Department by the end of that month.

42.     In May 2020, the Company was in the process of implementing a new accounting system from Mosaic Corp. ("Mosaic"), as per Hochland directives.

43.     In May 2020, there was a management lead call by CFO Rice with employees from Franklin, Hochland and Mosaic, where it was acknowledged that the

new accounting system was running extremely slow for some reason, and that Mosaic had been experiencing similar issues with other clients.

44.     Thereafter, in May 2020, Jatnna Marrero ("Ms. Marrero"), a Latina female, was hired as the Company's Director of Accounting and Sarah Teklehec ("Ms. Teklehec"), a Caucasian female, was hired as the Accounting Manager.

45.     Ms. Stephens was introduced to both Ms. Marrero and Ms. Teklehec the same day.

46.     The first time Ms. Marrero was introduced to Ms. Stephens, Ms. Marrero looked at Ms. Stephens with contempt and disgust, which Ms. Stephens believed to be due to the fact that Ms. Stephens was wearing an African headwrap.

47.     The same day, CFO Rice invited the entire accounting and finance team that was in the office to have lunch with him, including Ms. Marrero, Ms. Teklehec, and Ms. Anderson, but he excluded Ms. Stephens, who was the only employee in his department that was present in the office that day, but not invited.

48.     Richard Lam, Manager of Information Technology, who was also in the office that day, noticed the disparate treatment Ms. Stephens had received, having been singled out as not being invited to lunch by CFO Rice, and made a statement to that effect to Ms. Stephens.

49.     In Ms. Marrero's first formal meeting with the entire Accounting Department introducing herself and discussing Accounts Payable, Ms. Marrero remarked to the entire Accounting Department, including Ms. Stephens, that Ms. Stephens was a "mere data clerk", in attempt to demean and diminish the work Ms. Stephens performed for the Defendants.

50.     On June 11, 2020, Ms. Stephens was instructed by CFO Rice to train Ms. Teklehec and teach her how to use Franklin's systems.

51.     On the same day, Ms. Stephens was informed that Ms. Teklehec was now going to be Ms. Stephens' supervisor.

52.     On the same day, Ms. Stephens also learned that Ms. Marrero submitted a formal complaint (the "First Write Up") to CFO Rice and Valerie Wyss ("Ms. Wyss"), Human Resources Manager, a Caucasian woman, about Ms. Stephens. The First Write Up stated, among other things, that Ms. Stephens was paid overtime for handling technical issues associated with the new Mosaic accounting system, which senior management knew was an ongoing issue.

53.     The First Write Up from Ms. Marrero came approximately three (3) weeks after Ms. Marrero started working at the Company.

54.     Ms. Stephens was called into a meeting with Ms. Marrero, Ms. Wyss, and Ms. Anderson to discuss the First Write Up and was told she would be put on a remediation plan to address work related issues.

55.     Ms. Marrero blamed Ms. Stephens for a flawed check run on or around June 5, 2020 that was due to the new flawed Mosaic systems, which had been an ongoing issue that senior management of Defendants had been aware for several weeks, if not longer.

56.     During the First Write Up meeting, Ms. Wyss rolled her eyes at Ms. Stephens when Ms. Stephens asked what her rights were under the Company policies and procedures to be able to contest the First Write Up.

57.     It is believed Defendants had no formal written human resource policies for employees to properly address grievances, including those for discrimination, at such time.

58.     Ms. Stephens believed she was being discriminated against by Ms. Marrero due to Ms. Stephens' race and the color of her skin.

59.     Ms. Stephens sought medical treatment for anxiety around this time and for the first time in her life was prescribed medicine to treat anxiety.

60.     After the First Write Up meeting, Ms. Stephens sent an email to Ms. Wyss and CFO Rice, letting them know she wished to file a formal grievance to contest the First Write Up and need for a remediation plan because she felt like she was being discriminated against, treated differently and being used as a scape goat due to her race and the color of her skin.

61.     A few weeks after Ms. Stephens emailed CFO Rice and Ms. Wyss, they met with Ms. Stevens and told her they did not find any discrimination against Ms. Stephens.

62.     After this meeting, Ms. Stephens sent an email to Heidi Frueh ("Ms. Frueh"), a Caucasian woman and the Human Resources Manager at Hochland, because Ms. Stephens felt that her concerns about discrimination had not be adequately vetted and were not being taken seriously by Franklin.

63.     Ms. Frueh responded that she needed a few days to investigate, but after investigating she told Ms. Stephens that Ms. Stephens would be happy to hear the Company was going to rescind the First Write Up so there would be no need for a remediation plan.

64.     After contacting Ms. Frueh, CFO Rice told Ms. Stephens that she should have come to him before going above his head and sending something to Ms. Frueh at Hochland, making CFO Rice look bad, which Ms. Stephens understood to be a threat.

65.     CFO Rice acknowledged that the First Write Up and the remediation plan would however go away due to a misunderstanding.

66.     Despite CFO Rice's and Ms. Frueh's representations to the contrary, the First Write Up and the remediation plan did not go away.

67.     Instead, in an overtly disingenuous attempt to refute Ms. Stephens' complaints, on July 30, 2020, Defendants' Human Resource Manager added a photo of a Black Franklin employee to their Facebook page, announcing his promotion and CFO Rice encouraged Ms. Stephens to visit the Facebook page to show that the Defendants do not discriminate and were not racist.

68.     After the First Write Up, Ms. Teklehec, Ms. Marrero and CFO Rice selectively ignored the vast majority of Ms. Stephens emails, whereby she was requesting guidance from her supervisors on how they wanted her to handle her job.

69.     On August 10, 2020, Ms. Stephens was written up for a second time (the "Second Write Up").

70.     Despite assurances from both CFO Rice and Ms. Frueh that the First Write-Up had gone away and would not count against Ms. Stephens, the Second Write Up made it clear that the First-Write Up had not been removed from Ms. Stephens employment file and was being used by the Defendants against Ms. Stephens.

71.     On August 14, 2020, Ms. Stephens reported up the ladder as high as she could go and sent an email to Mr. Volker Bruetting, Chief Executive Officer of Hochland ("CEO Bruetting"), and Ms. Frueh objecting to discriminatory treatment.

72.     In a continued and overtly disingenuous attempt to refute Ms. Stephens complaints regarding Defendants' discriminatory actions, on August 14, 2020, only days after the Second Write Up and the same day of Ms. Stephens' renewed complaints of discrimination, Defendants' Human Resource Manager posted a new photo to their Facebook page of another non-Caucasian employee who was a new hire, promoting her "diversity", even though it had been more than three months since the new employee joined Franklin.

73.     CEO Bruetting never responded to Ms. Stephens August 14th email.

74.     Ms. Frueh never responded to Ms. Stephens August 14th email.

75.     Nobody from the Franklin or Hochland ever responded to Ms. Stephens, August 14th email.

76.     After August 14, 2020, Ms. Stephens supervisors and senior management from both Franklin and Hochland continued to ignore Ms. Stephens both telephonically and in her emails.

77.     Ms. Stephens was terminated by the Company on September 16, 2020 (the "Termination Date").

78.     Ms. Stephens suffered for over a month while her cries for help and guidance from Defendants' senior management teams fell of deaf ears.

79.     During the period after reaching out to CEO Bruetting for help and the Termination Date, Ms. Stephens suffered from even more anxiety than before and her physician prescribed a higher dose of anti-anxiety medication.

80.     From May 2020 to September 2020, it became all too clear that Franklin and Hochland management executives, members of the Human Resources departments, and Ms. Stephens supervisors exemplified racial and color bias towards Ms. Stephens.

81.     From August 14, 2020 to the date of this Charge, no further Facebook postings featuring individual employees of the Company have been made on the Company's Facebook page, and only the July 30, 2020 Facebook post and the August 14, 2020 Facebook post involve direct quotes from the Company's Human Resources Manager.

82.     Defendants' conduct demonstrated a clear and concerted effort to ignore, embarrass, humiliate and undermine Ms. Stephens, and attempt to make her a "scapegoat" for Defendants' operational failures in order to justify their refusal to even respond to her like a human being, which Defendants then tried to cover up by writing her up and whitewashing their Facebook page with seeming diversity.

83.     Notwithstanding her prior positive work performance reviews and wage and salary increases throughout her employment at Franklin, starting after the hire of CFO Rice and Ms. Marrero, Ms. Stephens was subjected to a series of unlawful employment practices in the form of racial bias, color bias, disparate treatment, hostile work environment, and ultimately wrongful termination in September 2020.

84.     Defendants did not care about fixing the corporate culture after Ms. Stephens first complained of racial and color discrimination.  They just wanted Ms. Stephens to go away, so they terminated her.

85.     Defendants terminated Ms. Stephens, but only after posting individual photos of two racially diverse employees to their Facebook page, contemporaneously with the First Write Up and the Second Write Up, in an effort to disguise their discriminatory actions in a non-discriminatory manner.

<u>FIRST CAUSE OF ACTION</u>
VIOLATION OF TITLE VII -DISCRIMINATION BASED ON RACE
(DISPARATE TREATMENT BEFORE FIRING)

86.     Ms. Stephens repeats and realleges every preceding allegation as if fully set forth herein.

87.     Because of Ms. Stephens's race, Defendants discriminated against Ms. Stephens and created a hostile work environment, which included, *inter alia*, not inviting her to lunch with her Caucasian colleagues, ignoring her and dismissing her complaints of disparate treatment and directing her to the Franklin's Facebook page as proof that the Defendants were not racist.

88.     Ms. Stephens's race was a primary factor why Defendants discriminated against her by creating a hostile work environment and treating her differently in the terms and conditions of employment than similarly situated Caucasian employees.

89.     The conduct of the Defendants in discriminating against Ms. Stephens due to her race was intentional. Defendants engaged in a discriminatory practice or practices with malice or with reckless indifference to the federally protected rights of the Ms. Stephens.

-13-

<u>SECOND CAUSE OF ACTION</u>
VIOLATION OF TITLE VII -DISCRIMINATION BASED ON COLOR
(DISPARATE TREATMENT BEFORE FIRING)

90.     Ms. Stephens repeats and realleges every preceding allegation as if fully set forth herein.

91.     Because of Ms. Stephens's color, Defendants discriminated against Ms. Stephens and created a hostile work environment, which included, *inter alia*, not inviting her to lunch with her non-black colleagues, ignoring her and dismissing her complaints of disparate treatment and directing her to Franklin's Facebook page as proof that the Defendants did not discriminate against black people.

92.     Ms. Stephens's color was a primary factor why Defendants discriminated against her by creating a hostile work environment and treating her differently in the terms and conditions of employment than similarly situated non-black employees.

93.     The conduct of the Defendants in discriminating against Ms. Stephens due to her color was intentional. Defendants engaged in a discriminatory practice or practices with malice or with reckless indifference to the federally protected rights of the Ms. Stephens.

<u>THIRD CAUSE OF ACTION</u>
VIOLATION OF TITLE VII -DISCRIMINATION BASED ON RACE
(TERMINATION)

94.     Ms. Stephens repeats and realleges every preceding allegation as if fully set forth herein.

95.     In their continuing efforts to support their discriminatory conduct, Defendants tried to create the appearance through the First Write Up and the Second Write Up that Ms. Stephens was not competent in her job.  Moreover, Ms. Stephens's complaints

to management about disparate treatment based on her race were ignored and summarily dismissed.

96.     On September 16, 2020, the Defendants wrongfully terminated Ms. Stephens's employment.

97.     Ms. Stephens's race and her complaints to management about discriminatory conduct was a motivating factor in their termination of her employment with Defendants.

98.     The conduct of the Defendants in firing Ms. Stephens because of her race was intentional. Defendants engaged in a discriminatory practice or practices with malice or with reckless indifference to the federally protected rights of the Ms. Stephens.

99.     As a direct and proximate result of Defendants' actions, Ms. Stephens has suffered and will continue to suffer lost wages, benefits and entitlements, damage to her career and reputation, personal humiliation, emotional pain, mental anguish, emotional distress, physical pain and suffering, loss of enjoyment of life and embarrassment justifying an award including, but not limited to, back pay, lost benefits, front pay, compensatory damages, and punitive damages according to proof against Defendants.

FOURTH CAUSE OF ACTION
VIOLATION OF TITLE VII -DISCRIMINATION BASED ON COLOR
(TERMINATION)

100.     Ms. Stephens repeats and realleges every preceding allegation as if fully set forth herein.

101.     In their continuing efforts to support their discriminatory conduct, Defendants tried to create the appearance through the First Write Up and the Second Write Up that Ms. Stephens was not competent in her job.  Moreover, Ms. Stephens's complaints

to management about disparate treatment based on her color were ignored and summarily dismissed.

102.    On September 16, 2020, the Defendants wrongfully terminated Ms. Stephens's employment.

103.    Ms. Stephens's color and her complaints to management about discriminatory conduct was a motivating factor in their termination of her employment with Defendants.

104.    The conduct of the Defendants in firing Ms. Stephens because of her color was intentional. Defendants engaged in a discriminatory practice or practices with malice or with reckless indifference to the federally protected rights of the Ms. Stephens.

105.    As a direct and proximate result of Defendants' actions, Ms. Stephens has suffered and will continue to suffer lost wages, benefits and entitlements, damage to her career and reputation, personal humiliation, emotional pain, mental anguish, emotional distress, physical pain and suffering, loss of enjoyment of life and embarrassment justifying an award including, but not limited to, back pay, lost benefits, front pay, compensatory damages, and punitive damages according to proof against Defendants.

FIFTH CAUSE OF ACTION
VIOLATION OF TITLE VII (42 U.S.C. § 2000e et seq.) – RETALIATION

106.    Ms. Stephens repeats and realleges every preceding allegation as if fully set forth herein.

107.    Ms. Stephens engaged in actions protected by Title VII, 42 U.S.C. § 2000e et *seq.*, which makes it unlawful for an employer to discriminate against an employee because she opposed and complained about unlawful employment practices.

108.     Because of Ms. Stephens's protected actions, Defendants retaliated against her by, among other things, creating a hostile work environment and terminating her for complaining to management about inappropriate and disparate treatment based on her race and color, and ultimately terminating her employment.

109.     The conduct of the Defendants in retaliating against Ms. Stephens because of her protected actions was intentional. Defendants engaged in a discriminatory practice or practices with malice or with reckless indifference to the federally protected rights of the Ms. Stephens.

<u>SIXTH CAUSE OF ACTION</u>
VIOLATION OF THE FCRA – DISCRIMINATION BASED ON RACE, COLOR AND HARASSMENT

110.     Ms. Stephens repeats and realleges every preceding allegation as if fully set forth herein.

111.     At all times material hereto, Defendants failed to comply with the FCRA, which states, in part, that it is an unlawful employment practice for an employer "[t]o limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee … [and] to discriminate against any individual, because of such individual's *race, color*, religion, sex, pregnancy, national origin, age, handicap, or marital status." (emphasis added) (Fla. Stat. § 760.10(1)(b)-(4).

112.     Defendants' discrimination and harassing conduct towards Ms. Stephens were based on her race.

-17-

113.   Defendants' discrimination and harassing conduct towards Ms. Stephens were based on her color.

114.   At all times necessary, Ms. Stephens was qualified to perform her duties and did so equally or better than her colleagues.

115.   Defendants' conduct was pervasive and regular and detrimentally affected Ms. Stephens.

116.   Defendants violated the FCRA by discriminating against Ms. Stephens because of her race. Alternatively, Ms. Stephens's race was a motivating factor which prompted the Defendants to harass and terminate her employment.

117.   Defendants violated the FCRA by discriminating against Ms. Stephens because of her color. Alternatively, Ms. Stephens's color was a motivating factor which prompted the Defendants to harass and terminate her employment.

118.   Any alleged nondiscriminatory reason for this treatment of Ms. Stephens by the Defendants is a mere pretext for the actual reason for discriminating against her based on her race.

119.   Any alleged nondiscriminatory reason for this treatment of Ms. Stephens by the Defendants is a mere pretext for the actual reason for discriminating against her based on her color.

120.   Defendants' actions were malicious and were recklessly indifferent to Ms. Stephens's rights pursuant to Fla. Stat. §760.10.

121.   The aforementioned actions of the Defendants were done wantonly, willfully, maliciously and with reckless disregard of the consequences of such actions.

<u>SEVENTH  CAUSE OF ACTION</u>

-18-

VIOLATION OF THE FCRA – RETALIATION

122.     Ms. Stephens repeats and realleges every preceding allegation as if fully set forth herein.

123.     Ms. Stephens engaged in actions protected by the FCRA and opposed any practice unlawful under the FCRA.

124.     Because of Ms. Stephens's protected actions, Defendants retaliated against Stephens by, among other things, creating a hostile work environment for Ms. Stephens, ignoring her emails seeking help and direction, and even her up the ladder reporting to Hochland CEO Bruetting, which nobody from Defendants ever even acknowledged and was totally ignored, resulting in the wrongful termination by Defendants of Ms. Stephens's employment.

125.     The conduct of the Defendants in retaliating against Ms. Stephens because of her protected actions was intentional. Defendants engaged in a discriminatory practice or practices with malice or with reckless indifference to the state protected rights of Ms. Stephens.

<u>PRAYER FOR RELIEF ON BEHALF OF STEPHENS FOR ALL CAUSES OF ACTION</u>

WHEREFORE, Plaintiff Ms. Stephens respectfully requests the following relief:

1.     An order declaring that Defendant violated Plaintiff's rights under Title VII and the FCRA;

2.     An order for compensatory damages for emotional pain, suffering, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

3.     An order for back pay, including the economic value of lost employment benefits and interest on back pay;

4.      An order for front pay, including interest on front pay;

5.      An order for reasonable attorneys' fees and costs

6.      An order for punitive damages;

7.      An order enjoining Defendants from engaging in any such unlawful employment practice under Title VII and the FCRA;

8.      And for any other affirmative action or equitable relief as the Court deems appropriate;

9.      And for such other and further relief as the Court deems just and proper.


Dated: July 12, 2021

                        ADLER WELLIKOFF PLLC

                        By: __/s/ Scott M. Wellikoff
                            Scott M. Wellikoff
                            Aaron S. Adler

                        1900 Glades Road, Suite 270
                        Boca Raton, Florida
                        Phone/Fax:  561-508-9591
                        swellikoff@adwellgroup.com
                        aadler@adwellgroup.com

                        *Attorneys for Plaintiff*